**Thomas J. LAVEY and The Lakeland Group, Incorporated, Plaintiffs–Appellants,**

v.

**The CITY OF TWO RIVERS, Defendant–Appellee.**

No. 98–1785.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1998.

Decided March 25, 1999.

Marc T. McCrory (argued), Brennan, Steil, Basting & MacDougall, Janesville, WI, for Plaintiffs–Appellants.

Winston A. Ostrow, Donald L. Romundson (argued), Godfrey & Kahn, Green Bay, WI, for Defendant–Appellee.

Before WOOD, JR., RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Thomas Lavey and his corporation, the Lakeland Group, Inc., filed this action against the City of Two Rivers. They sought injunctive and declaratory relief against a Two Rivers ordinance regulating outdoor advertising. The district court granted Two Rivers' motion for summary judgment. Mr. Lavey has appealed. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

**I**

**BACKGROUND**

**A. The Ordinance**

Two Rivers enacted an extensive ordinance regulating the placement and nature of outdoor advertising. In enacting the ordinance, Two Rivers recognized, in the ordinance's preamble, "the need to protect the safety and welfare of the public; the need for well-maintained and attractive sign displays within the community, and the need for adequate business identification, advertising, and communication." Ordinance § 10–3–1(a), R.30, Ex.A.

The heart of the ordinance is a provision that requires a permit for any sign or awning erected, constructed, enlarged or structurally modified within the City.[1] The ordinance further provides that an application for a permit shall be filed with the Zoning Administrator and identify the name of the owner and the contractor.[2] The application must include, among other information, a drawing of the sign and a description of the materials to be used in its construction.[3]

The ordinance distinguishes between on-premises and off-premises signs. The ordinance defines "off-premises sign" to mean "[a] sign which advertises goods, products, facilities or services not necessarily on the premises where the sign is located, or directs persons to a different location from where the sign is located." Ordinance § 10–3–2(a)(19). It also defines "on-premises sign" to mean "[a]ny sign identifying or advertising a business, person, activity, goods, products or services located on a premises where the sign is

---

1. Section 10–3–3 states:

   Except as otherwise provided in this chapter, it shall be unlawful for any person to erect, construct, enlarge or structurally modify any sign, or awning in the City, or cause the same to be done without first obtaining a permit for each such sign or awning from the Zoning Administrator as required by this chapter. Permits shall not be required for a change of copy on any sign or for the repainting, cleaning, and other normal maintenance or repair of signs, sign structures or awnings. Permits shall become null and void if installation is not completed within one year from date issued.

2. *See* Ordinance § 10–3–4(a)(1).

3. *See* Ordinance § 10–3–4(a)(2).

installed and maintained." Ordinance § 10–3–2(a)(20).

A more precise examination of the ordinance's distinction between on-premises and off-premises signs is instructive. The ordinance contains general regulations on signs—regardless of whether they are off- or on-premises. For example, § 10–3–11 contains requirements for maintenance and repair that are applicable to "every sign"—even signs that are not required to receive a permit. Subsections (a) and (d) of § 10–3–14 contain various construction specifications applicable to all signs. Section 10–3–16 contains size and set-back restrictions applicable to various types of signs, but, with the exception of subsection (m), does not distinguish between on-premises signs and off-premises signs. However, in addition to these general requirements applicable to all signs, the ordinance contains further restrictions that treat on-premises signs less stringently than off-premises signs. With respect to location, § 10–3–18(a) permits on-premises signs in areas zoned as conservancy and residential districts; it does not allow off-premises signs in such areas. With respect to the number and size of signs, areas zoned for business and industrial use may contain up to three on-premises billboards totaling 300 square feet; only two off-premises billboards totaling 100 square feet are allowed in such areas. With respect to the size of highway signs, on-premises signs are subject to no square footage restriction; off-premises highway signs have a 300 square-foot area restriction. With respect to the spacing of highway signs, off-premises highway signs are subject to spacing limitations to which on-premises highway signs are not subject. Off-premises highway signs may not be located within 300 feet of any other off-premises sign, a residential property or a residential district. Finally, on-premises signs exceeding other limits in the ordinance may be allowed on fully developed sites exceeding five acres in area if they identify the on-site business.[4]

Certain signs are exempt from the permit requirement.[5] The ordinance also contains a list of signs that are forbidden.[6] The ordinance forbids signs that will interfere with traffic either by creating confusion with traffic signs or by obscuring the driver's line of sight.[7] Signs that contain obscene, pornographic, or immoral words or pictures are also forbidden as is signage that is "untruthful." [8]

The ordinance further provides: "Notwithstanding any other provision contained herein to the contrary, noncommercial messages may be contained on any autho-

---

4. *See* Ordinance § 10–3–18.

5. *See* Ordinance § 10–3–13. Exempt signs include contractors' signs that meet the ordinance's specifications at either residential or non-residential sites, directional and instructional signs that meet the ordinance's specifications, governmental flags and insignia as well as corporate flags. Other exemptions are government signs erected for public safety purposes as well as public notices and public signs required for other governmental purposes, home occupation signs, house numbers, interior signs, memorial signs and plaques that meet specific criteria, and "no trespassing" or "no dumping" signs. Political and campaign signs are exempt during electoral campaigns as long as they meet certain size and location specifications set forth in the ordinance. There are also exemptions for real estate signs that meet the ordinance's criteria, window signs, on-premises insignia of recognized historic agencies or religious orders, and temporary on-premises signs for civic, philanthropic, educational, and religious organizations as long as the signs do not exceed the size specified in the statute and are posted within the time period specified by the ordinance. Incidental vehicular signs, neighborhood identification signs meeting the ordinance's specifications and temporary rummage sale signs meeting the ordinance's specifications are also exempt.

6. These include signs painted directly on buildings, sandwich signs, certain movable signs and advertising on vehicles, abandoned signs, animated or moving signs, unshielded illuminated signs, and reflection signs. *See* Ordinance § 10–3–12(a)–(j).

7. *See* Ordinance § 10–3–12(k)(1), (2).

8. *See* Ordinance § 10–3–12(k)(3).

rized sign." Ordinance § 10–3–1(c). Although the ordinance contains an extensive definitional section, it does not define the terms "commercial" or "noncommercial."

The ordinance requires that the Zoning Administrator issue a permit when an application is properly made, appropriate fees are paid, and the sign conforms with "the appropriate ordinances of the City." Ordinance § 10–3–6. If the permit is denied, the Zoning Administrator must give written notice to the applicant, together with a brief written statement of the reasons for the denial.[9] In the case of a denial, the applicant may appeal to the City's Sign Board of Appeals whose membership is those individuals who serve on the Zoning Board of Appeals.[10]

The Zoning Administrator also has the duty to enforce the ordinance. Upon written notification of a violation, the owner must bring the sign into compliance or the sign is removed at the owner's expense.[11] The ordinance also provides for other penalties.

## B. The Plaintiffs

Mr. Lavey is in the business of managing outdoor advertising and has several signs in Two Rivers. He is the president of the Lakeland Group, which is in the advertising and public relations business. For the past fifteen years, Mr. Lavey and the Lakeland Group have owned and maintained billboards and made them available to the public for the dissemination of commercial and noncommercial messages. The district court noted that about half of

the messages on the signs change monthly. The City frequently has cited Mr. Lavey and Lakeland for placing off-premises signs in areas where the ordinance does not allow such signs.[12]

Mr. Lavey brought this action in the United States District Court for the Eastern District of Wisconsin. Alleging a cause of action under § 1983, he sought a declaration that the ordinance violated his First Amendment rights, as secured against state encroachment by the Fourteenth Amendment. He further alleged that the ordinance violated the Due Process Clauses of the Fourteenth Amendment and of the Wisconsin Constitution. We shall detail below with more specificity the allegations made in the district court that are renewed on appeal and are therefore before us for decision.[13]

## II

## DISCUSSION

### A. The *Central Hudson* Analysis

■ Mr. Lavey first contends that the ordinance does not withstand analysis under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). That case adopted a four-part test to determine when a restriction on commercial speech is valid under the First Amendment. First, only speech that is truthful and not misleading receives First Amendment protection. Second, the restriction must seek to implement a substantial government interest. Third, the restriction

9. *See id.*

10. *See* Ordinance § 10–3–7.

11. *See* Ordinance § 10–3–9.

12. The record does not reveal how many times Mr. Lavey has been charged under the ordinance.

13. We note that, at the beginning of its analysis, the court addressed whether the previous litigation in state court in any way precluded the bringing of this case in the district court. After ordering the parties to brief the matter,

the court determined that the state court had not addressed the constitutional challenges brought in the present action and that, therefore, neither claim nor issue preclusion barred this action. Although the district court did not address explicitly whether the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny were applicable, the record contains no suggestion that a prosecution of any of the plaintiffs was pending at the time this action was commenced.

must directly advance that interest. Fourth, the restriction must reach no further than necessary to accomplish its objective. *See id.* at 564, 100 S.Ct. 2343.

██ Although Mr. Lavey contends that the City's ordinance violates the latter three prongs of this test, we think that the focus ought to be on the last two. The second consideration poses no significant constitutional issue. After the Supreme Court's decision in *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), we do not think that it can be said that the City's interests in traffic and aesthetics are not substantial municipal goals. *See id.* at 507–08, 101 S.Ct. 2882. We therefore turn to the two remaining considerations.

██ In *Metromedia*, the Supreme Court upheld the portion of a San Diego ordinance that allowed on-premises advertising yet disallowed off-premises advertising.[14] San Diego asserted the same interests that Two Rivers asserts in this case. *See id.* at 507–08, 101 S.Ct. 2882. The Court's inquiry focused on the third prong and held that the restriction on off-premises advertising directly advanced the state's interest. The Court initially noted that the restriction was based on "common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Id.* at 509, 101 S.Ct. 2882. Additionally, the Court stated that "[i]t is not speculative to recognize that billboards, by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Id.* at 510, 101 S.Ct. 2882. The Court went on to reject the contention that the San Diego ordinance's provision banning off-premises advertising, while allowing on-premises advertising, de-

nigrated its interests in safety and aesthetics. First, said the Court, this underinclusiveness did not prevent the ordinance from advancing the safety and aesthetics goals. Second, San Diego could have believed that off-premises advertising, with its changing content, could present a greater threat to its goals. Third, San Diego could choose to value one kind of commercial speech, on-site advertising, over another, off-site advertising. *See id.* at 511–12, 101 S.Ct. 2882.

As we noted in *Pearson v. Edgar*, 153 F.3d 397 (7th Cir.1998), since *Metromedia*, the Supreme Court's subsequent decision in *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), emphasized the necessity of a close fit between an ordinance's restriction on commercial speech and the goals of that ordinance.[15] Recognizing that, as a general proposition, speech proposing a commercial transaction is entitled to lesser protection than other constitutionally guaranteed expression, *see id.* at 422, 113 S.Ct. 1505; *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), *Discovery Network* nevertheless invalidated commercial speech regulations because the underinclusiveness of the restriction made the fit between the regulation's goals and the restrictions not sufficiently close. *In Discovery Network*, the Court struck down a city ordinance that prohibited commercial handbills while allowing newspapers displayed on newsracks. The Court determined that this underinclusiveness—the prohibition of commercial handbills and the tolerance of newsracks—revealed the absence of a sufficient fit between these restrictions and the ordinance's safety and aesthetic goals. The Court noted that, in

---

14. A four-Justice plurality joined in the lead opinion of Justice White. However, the portion of the *Metromedia* opinion relevant here was also joined by Justice Stevens. Therefore, the lead opinion represented a five-Justice majority of the Court on these issues.

15. "The last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).

*Metromedia,* there had been a fit between the banning of off-site advertising and the San Diego ordinance's safety and aesthetic goals. *See* 507 U.S. at 425 n. 20, 113 S.Ct. 1505. Significantly, however, the Court also remarked:

> [*Metromedia*] did not say ... that San Diego could distinguish between commercial and noncommercial offsite billboards that cause the same esthetic and safety concerns. That question was not presented in *Metromedia,* for the regulation at issue in that case did not draw a distinction between commercial and noncommercial offsite billboards; with a few exceptions, it essentially banned all offsite billboards.

*Id.*[16]

Mr. Lavey argues that the ordinance in this case is impermissibly underinclusive because it exempts noncommercial and other signs from the restrictions on off-site advertising.[17] His contention has been expressed in various ways at various stages of this litigation. In his opening brief in this court, Mr. Lavey primarily submits that the Two Rivers ordinance is underinclusive because of the many exceptions to its restrictions on off-premises commercial advertising. The ordinance is underinclusive, he contends, because there is not an adequate fit between the distinctions made by the ordinance and the ordinance's safety and aesthetic goals. Our review of the text of the ordinance confirms, however, the district court's view that the ordinance is "carefully-crafted" to meet the safety and aesthetic goals it articulates. Mem. Op. at 16. Mr. Lavey's anecdotal descriptions of past errors in interpretation cannot change the fact that the language and structure of the ordinance is designed to "directly advance" the town's articulated interests. We must "judge the validity of the restriction in this case by the relation it bears to the general problem ..., not by the extent to which it furthers the Government's interest in an individual case." *United States v. Edge Broad. Co.,* 509 U.S. 418, 430–31, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993).[18] Therefore, to the extent that Mr. Lavey's case may be construed as an "as applied" challenge to the validity of the ordinance, that challenge cannot be sustained.

After oral argument, the parties were asked to submit supplemental briefs. In his supplemental brief, Mr. Lavey submits that Two Rivers has failed to demonstrate sufficiently that off-premises commercial advertising presents dangers to safety and

---

**16.** Although in *Discovery Network* the Court stated that the *Metromedia* Court did not decide the issue presented by this case, we note that, in *Metromedia,* the Court instructed the California courts to uphold an ordinance similar to the one in this case. *See Metromedia,* 453 U.S. at 521 n. 26, 101 S.Ct. 2882. *Metromedia* involved an ordinance that banned all outdoor signs except for on-premises commercial advertising and twelve other types of signs. The Court upheld the on/off-premises distinction, but invalidated the entire statute because it discriminated against noncommercial signs. In footnote 26, the Supreme Court instructed the California courts that they could uphold the ordinance by construing it to apply only to commercial signs. The ordinance envisioned by this footnote appears very similar to the ordinance that Two Rivers passed approximately one year after the *Metromedia* decision—one combining an on/off-premises distinction with a commercial/noncommercial distinction, and allowing for a specified list of other exemptions. However,

this footnote is not dispositive in this case in light of the later *Discovery Network* footnote implying that such an ordinance is underinclusive unless sufficient evidence of a fit between the distinction and the city's safety and aesthetics goals exists.

**17.** For example, the ordinance specifically exempts construction signs, government signs, house number and name plate signs, interior signs, memorial signs and plaques, "no trespassing" or "no dumping" signs, public notice signs, political signs, real estate signs, vehicular signs and neighborhood identification signs.

**18.** *In Edge Broadcasting,* the Supreme Court remarked that, although *Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), permitted an "as applied" challenge in the *Central Hudson* context, the challenge must be to a broad category of commercial speech, not simply to the regulation of the plaintiff's speech.

aesthetics that are not also inherent in off-premises noncommercial advertising. It is not readily apparent that the ordinance makes a distinction between off-premises commercial and off-premises noncommercial advertising.[19] However, assuming arguendo that there is such a distinction under the ordinance, after examination of the record, we do not think that the possibility of this sort of underinclusiveness was presented adequately for decision by the district court. Indeed, in the litigation of the summary judgment motion, Mr. Lavey took the position that the ordinance discriminated in favor of commercial speech, not against it.

We think that the exemption of other signs, such as construction signs and government signs, from the strictures of the ordinance is fully justified. We do not read *Discovery Network* as requiring a local legislature to make a voluminous record in order to justify such common-sense exceptions. *See Fox*, 492 U.S. at 477–81, 109 S.Ct. 3028.

## B. Vagueness and Delegation of Enforcement Authority

■ We next address two closely related claims of Mr. Lavey. He contends that the ordinance is vague and that, as a consequence of that vagueness, the enforcement administrator has far too much latitude in determining whether a particular sign is in violation of the ordinance. Indeed, he claims that the ordinance is so vague that the administrator based his decisions on whether the advertisement is "generic," a term not found or defined in the ordinance. He also submits that the on/off-premises distinction is ambiguous and that, although the statute exempts

noncommercial speech from coverage, it does not define noncommercial speech.

We cannot accept this argument. An examination of the ordinance makes it clear that it provides sufficient notice as to its prohibitions. Administrators also are provided sufficient guidance with respect to its meaning. The on– and off-premises distinction is well defined by the ordinance.[20] Additionally, the record indicates that the administrator's use of the term "generic" was merely his short-hand way of referring to the commercial/noncommercial distinction.

*Discovery Network* counsels that, in some contexts, the failure to define the distinction between commercial and noncommercial speech might result in an impermissible delegation of authority. *See Discovery Network*, 507 U.S. at 423 & n. 19, 113 S.Ct. 1505. In the context of this case, however, we do not believe that such a danger exists. Commercial advertising has long been well defined by Supreme Court commercial speech doctrine. It "constitutes paradigmatic commercial speech ... because its fundamental purpose is to propose an economic transaction." *See Commodity Trend Serv., Inc. v. CFTC*, 149 F.3d 679, 684 (7th Cir.1998). The distinction between commercial and noncommercial advertisements is therefore a great deal more obvious than the distinction between newspapers and commercial handbills that was at issue in *Discovery Network*.

## C. Strict Liability Punishment

■ Finally, Mr. Lavey argues that, as interpreted by the city administrators and

---

**19.** As we have noted earlier, the ordinance provides: "Notwithstanding any other provision contained herein to the contrary, noncommercial messages may be contained on any authorized sign." Ordinance § 10–3–1(c).

**20.** Two Rivers' Municipal Code § 10–3–2(a)(19) defines "off-premises sign" to mean "[a] sign which advertises goods, products,

facilities or services not necessarily on the premises where the sign is located, or directs persons to a different location from where the sign is located." Municipal Code § 10–3–2(a)(20) defines "on-premises sign" to mean "[a]ny sign identifying or advertising a business, person, activity, goods, products or services located on a premises where the sign is installed and maintained."

 

state courts, the ordinance punishes violations of the ordinance without regard to intent. Relying on the Supreme Court's decision in *Smith v. People of State of California*, 361 U.S. 147, 153–55, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), in which the Court held that it is impermissible to punish a bookseller for selling obscene material without proof of scienter, Mr. Lavey contends that he cannot constitutionally be held liable under an absolute liability offense. As an example of strict liability prosecution, Mr. Lavey cites his prosecution for displaying a sign that, in his view, advertised the use of his billboards and therefore qualified as on-premises advertising. Mr. Lavey did not know that the sign contained the Sunkist logo in the background. The City determined that the sign constituted off-premises advertising of oranges. The state court held that Mr. Lavey's mistake was not relevant under the ordinance, and therefore it did not provide the jury with a mistake instruction.[21]

We believe that the analogy to the bookseller in *Smith* limps. Mr. Lavey makes no showing that, like a bookseller, who cannot possibly read through all of his books, he does not have the means to inform himself of the contents of the advertising he displays.

### Conclusion

On the record before us in this case, Mr. Lavey has failed to establish that the ordinance cannot withstand scrutiny under *Central Hudson*. The ordinance is not vague and does not place undelegated authority in the hands of those charged with its administration. Nor has it been demonstrated that the absence of an intent element renders the ordinance unconstitu-

tional. Accordingly, we affirm the judgment of the district court.

AFFIRMED

---

21. Mr. Lavey's argument is not barred by the *Rooker-Feldman* doctrine because he is challenging the City's ongoing interpretation of the contract, and not jury instructions from a particular case in state court. *See District of* *Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923).